[Cite as *State v. Lundy*, 2014-Ohio-3934.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 14AP-198 |
| v. | : | (C.P.C. No. 12CR-3892) |
| Markale I. Lundy, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 11, 2014

*Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee.

*Barnhart Law Office, LLC*, and *Robert B. Barnhart*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

O'GRADY, J.

{¶ 1} Defendant-appellant, Markale I. Lundy, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} In August 2012, appellant was indicted for aggravated burglary, in violation of R.C. 2911.11; two counts of kidnapping, in violation of R.C. 2905.01; two counts of aggravated robbery, in violation of R.C. 2911.01; attempted murder, in violation of R.C. 2923.02; and felonious assault, in violation of R.C. 2903.11. He pleaded not guilty to the charges, and the matter proceeded to a jury trial. A summary of the pertinent evidence follows.

{¶ 3}   Andrea Newman and SeTecia Hayes met while incarcerated and shared an apartment after their release.  In March 2012, Newman met appellant on a bus.  They had a conversation and appellant "expressed that he had heard of" Hayes and said "something about knowing her from the west side."  (Tr. Vol. I, 49, 106.)   Newman and appellant exchanged phone numbers.   From March to May 2012, the pair communicated, and appellant went to Newman's apartment a few times when Hayes was not home.  Newman invited appellant to her apartment on May 13, 2012.   Upon arriving, appellant asked Newman to contact Hayes, who was not home, so he could purchase marijuana from her.  Newman testified she and Hayes both used marijuana, and Hayes sold it from the apartment along with Hayes' boyfriend, Scoop.

{¶ 4}   Newman contacted Hayes via text, and Hayes informed Newman she had a flat tire but help was on the way.  Subsequently, appellant went into the kitchen, and when he returned, he pulled Newman's hair back, got close to her ear, and said, "where is the * * * money"?  (Tr. Vol. I, 59.)  Newman told appellant she did not have any money.  Appellant said, "where's my four grand," and stabbed her in the neck.  (Tr. Vol. I, 60.)  Newman did not know what he was talking about.  Appellant made Newman go upstairs to Hayes' bedroom and search the room for money.  While Newman was searching the closet, appellant stabbed her in the neck again.  Then Hayes came home, and appellant went downstairs.

{¶ 5}   Newman heard appellant yell, "where's the money"?  (Tr. Vol. I, 65.)  Then she heard Hayes tell appellant it was upstairs and ask him not to hurt her.  Eventually, Hayes and appellant came into Hayes' bedroom.  Hayes started to cry and asked appellant if Newman was dead.  Newman heard appellant say he had broken Newman's jaw and knocked her out.  Newman then heard appellant going through Hayes' purse and ask if she "had anything else."  (Tr. Vol. I, 67.)   Then Hayes and appellant went into the bathroom.  Newman heard a lot of noise and what sounded like appellant talking to himself or someone else on a phone.  Newman did not actually see appellant with a phone. Newman heard appellant mention the name Tony and say Scoop shot his cousin in the face.  Appellant then came back into Hayes' room and stabbed Newman several times in the chest.  Appellant told Hayes she "picked the wrong guy," mentioned Scoop, and again brought up his cousin's shooting.  (Tr. Vol. I, 72.)

{¶ 6} Next, Newman heard appellant use a spray product in the apartment, she presumed to remove his fingerprints from items. He used the spray on her fingernails because she scratched him at one point during the encounter. Newman heard appellant tell Hayes he knew her cousin and sister, and threaten to kill Hayes' family. He instructed Hayes and Newman to tell the police "two white guys" had attacked and robbed them. (Tr. Vol. I, 75.) After appellant left, Newman went to the bathroom where Hayes was bound with the cord to Newman's flat iron. She tried to free Hayes and then called 911. At one point, the 911 operator asked Newman who stabbed her, and Newman said, "I don't know." (Tr. Vol. I, 79.) Newman testified she gave that response out of fear. Newman initially told police two white men had attacked her because she was afraid and wanted to protect herself, Hayes, and Hayes' family. On June 28, 2012, she gave police a letter identifying appellant as her attacker. Newman did not want to lie anymore.

{¶ 7} Because of the attack, Newman was in the hospital for around two weeks and then went to a rehabilitation center for several months. She spent 15 days on a respirator and had a feeding tube for a few months. At the time of trial, Newman still had limited mobility in her neck. In addition, she testified her wallet and cell phone were missing after the incident.

{¶ 8} Hayes testified after she entered the apartment, appellant ran toward her with a knife. Hayes claimed she had never seen him before. Appellant told Hayes not to scream or he would kill her. He grabbed her by the hair and demanded money. Hayes told appellant she had money in her purse upstairs, and they went to Hayes' bedroom. Hayes saw Newman and asked appellant if she was dead. Appellant claimed he broke Newman's jaw and knocked her out. Appellant took $300 and some marijuana from Hayes' purse and told her to find something to tie herself up with. She found a curling iron, and appellant used that to bind her hands behind her back. Then he made Hayes go into the bathroom, where he tied her hands and feet together with "wiring of some sort." (Tr. Vol. II, 253.) Appellant left the bathroom, and Hayes heard him talking, apparently having a phone conversation. Hayes never saw the phone. She heard appellant say something to the effect of "pull the car up." (Tr. Vol. II, 252.)

{¶ 9} Appellant returned to the bathroom and instructed Hayes that if she loved her family, she had to tell police "two white guys" robbed her and Newman. (Tr. Vol. II,

253.) He gave Newman the same instructions. After appellant left, Newman called 911, and at one point, Hayes spoke to the 911 operator and claimed she did not know who the perpetrator was. Then, out of fear, Hayes told police two white men robbed and attacked her and Newman. Later, she identified appellant as the perpetrator. Hayes denied selling marijuana from the apartment. She claimed Scoop was an acquaintance of hers, and she never heard appellant mention Scoop's name during the incident.

{¶ 10} The state introduced evidence that Hayes, Newman, and appellant could not be excluded as contributors to a DNA mixture on a cell phone charger cord found at the apartment. In addition, the state introduced evidence that Newman was the major contributor to a DNA mixture on a curling iron cord, and Hayes and appellant could not be excluded as minor contributors to the mixture.

{¶ 11} The parties stipulated the phone number Newman used to contact appellant on May 13, 2012 was not registered to him. The parties also stipulated the cell phone associated with the number was not found to be in the vicinity of Newman and Hayes' apartment when the incident at issue occurred.

{¶ 12} The jury found appellant guilty of all charges, and the trial court sentenced him to 22 years in prison.

## II. ASSIGNMENT OF ERROR

{¶ 13} Appellant appeals and assigns one error for our review:

APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. DISCUSSION

{¶ 14} Under his sole assignment of error, appellant contends his convictions were against the manifest weight of the evidence. " '[T]he criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief.' " *State v. Butler,* 10th Dist. No. 13AP-360, 2013-Ohio-5397, ¶ 12, quoting *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42

(1982). " ' "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." ' " *Butler* at ¶ 12, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  This discretionary authority " ' "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." ' "  *Id.,* quoting *Thompkins* at 387, quoting *Martin* at 175.

{¶ 15} "[A] defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was offered at trial." *State v. Bailey*, 10th Dist. No. 12AP-699, 2013-Ohio-3596, ¶ 23, citing *In re C.S.*, 10th Dist. No. 11AP-667, 2012-Ohio-2988, ¶ 27.  "The trier of fact is free to believe or disbelieve any or all of the testimony presented" because it is "in the best position to take into account the inconsistencies in the evidence, as well as the demeanor and manner of the witnesses, and to determine which witnesses are more credible." *Id.*  Thus, although an appellate court sits as a "thirteenth juror" when it considers a manifest weight argument, "it must also give great deference to the trier of fact's determination on the credibility of the witnesses." *Id.*

{¶ 16} Appellant contends his convictions were against the manifest weight of the evidence because the testimony of Newman and Hayes was so incredible and inconsistent the jury lost its way in crediting it.  First, he points to the fact that Newman testified Hayes sold marijuana, and Hayes denied doing so.  As the state points out, it is illegal to sell marijuana, so Hayes' denial is not surprising.  The jury could have thought Hayes lied about this detail to protect herself from criminal liability and still believed her testimony about appellant's criminal actions on May 13, 2012.

{¶ 17} Next, appellant complains Newman testified Hayes and appellant knew each other, but Hayes denied knowing appellant.  Newman testified appellant "expressed that he had heard of" Hayes and said "something about knowing her from the west side." (Tr. Vol. I, 49, 106.)  However, Newman did not have personal knowledge that appellant and Hayes knew each other, so that portion of Newman's testimony is not inconsistent with Hayes' testimony.  Admittedly, some of Newman's other testimony suggests appellant, Hayes, and/or Scoop knew each other.  The jury may have thought Hayes lied

about the relationship to protect herself and Scoop from criminal liability for the sale of marijuana or a possible shooting. Nonetheless, the jury could discredit Hayes' testimony about not knowing appellant and still believe he victimized Hayes and Newman as they claimed.

{¶ 18} Appellant also argues that Newman and Hayes are not credible because they told the 911 dispatcher they did not know who attacked them and initially told police two white men were the perpetrators. The women explained that they lied out of fear, which, particularly in light of the severity of Newman's injuries, was a reasonable excuse the jury was free to believe.

{¶ 19} Next, appellant suggests his convictions were against the manifest weight of the evidence because the women heard him talking to someone on the phone during the incident, but the phone he used to contact Newman was not in the vicinity of the apartment during the attack. However, Hayes and Newman did not actually see appellant with a phone during the incident, and could not confirm whether he was actually talking on the phone. Moreover, the phone appellant used earlier that day was not registered to him. We fail to see why the jury could not entertain the possibility appellant used a different phone in the apartment than he used to contact Newman.

{¶ 20} Finally, as appellant points out, DNA evidence taken from the apartment was not conclusive. Even so, appellant could not be excluded as a contributor to DNA mixtures on the two cords which were presumably used to tie up Hayes. This DNA evidence, when coupled with the testimony of Hayes and Newman, amply supports appellant's convictions.

{¶ 21} The evidence in this case did not weigh heavily against conviction. Appellant's convictions were not against the manifest weight of the evidence. Therefore, we overrule the sole assignment of error.

## IV. CONCLUSION

{¶ 22} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER, P.J., and CONNOR, J., concur.